NORTON *v.* NAT. BANK OF COMMERCE OF PINE BLUFF

5-3572                                              398 S. W. 2d 538

Opinion delivered January 31, 1966

*Carlton Currie,* for appellant.

*Bridges, Young & Matthews*, for appellee.

Brief *amicus curiae, Harry E. Meek* and *Joe E. Barrett*,

GEORGE ROSE SMITH, Justice. This case presents a number of questions of first impression under the Uniform Commercial Code.

On September 4, 1963, the appellant Norton, an automobile dealer, sold a 1957 Oldsmobile sedan to Billy Goldsmith, who executed a promissory note and a conditional sales contract for the unpaid purchase price. On the same day Norton in turn sold the note and contract to the appellee bank. Norton endorsed the note and executed a written assignment of the contract, with a provision that if Goldsmith should default in his obligation Norton would repurchase the contract for the amount due thereon (with costs and expenses).

Goldsmith defaulted after having made only two monthly payments. On January 9 the bank repossessed the car, notifying Goldsmith by letter that it had done so. On January 24, without notice either to Goldsmith or to Norton, the bank sold the car to one of its customers, by private sale for $75.00. This left an unpaid balance of $277.88 on the debt. The bank demanded that sum from Norton, who refused to pay.

The bank sued Norton only. According to the undisputed evidence it had been the bank's uniform custom in the past to give Norton and other dealers an opportunity to repurchase such contracts. Norton had never failed to repurchase when asked to do so. The manager of the bank's personal loan department was unable to explain why in this instance the bank for the first time proceeded against the car without notice to the dealer. There is evidence that a 1957 Oldsmobile would sell for from $25.00 to $125.00. It is admitted that an automobile dealer is in a better position than a bank to obtain full value in the sale of a used car.

The circuit court, sitting without a jury, found that the bank had obtained a fair price for the car and entered judgment against Norton for the balance due on the debt. Norton contends that the bank should have given him notice of the proposed sale, so that he might protect himself by repurchasing the commercial paper and reselling the car himself. He insists that the bank's failure to give him notice discharged his entire liability.

We requested *amicus curiae* briefs from Joe C. Barrett and from Harry E. Meek, for which we are grateful. Mr. Barrett states that the Permanent Editorial Board of the Uniform Commercial Code makes its services available to appellate courts when the interpretation of the Code is in issue. Members of the Permanent Board assisted Mr. Barrett in the preparation of his brief.

The two *amicus* briefs discuss the provisions of the Code in greater detail than counsel for the litigants have done. Both *amici* are of the view that Norton was not entitled to notice that a private sale was contemplated, for the reason that Norton was not a "debtor" within the pertinent section of the Code. Ark. Stat. Ann. § 85-9-504 (3) (Add. 1961). They seem, however, to reach the same result that would follow if Norton had been entitled to notice. That is, they concede that the bank acted improperly, that it should have given Norton an opportunity to repurchase the contract, and that it is liable to Norton for any damages he suffered as a result of the bank's misconduct. (One of the *amici* would award Norton, in addition to his actual damages, the finance charge and penalty set out in § 85-9-507 [1] of the Code. The other would award the finance charge plus penalty, when the actual damages cannot be fixed with reasonable certainty.)

It is our conclusion that Norton *was* a debtor within the terms of the statute and was therefore entitled to notice that a private sale was impending. The statute requires notice to a "debtor," with certain exceptions. Section 85-9-504 (3). We dismiss two possible exceptions

to the requirement of notice before reaching the main issue.

First, the Code dispenses with notice when the collateral to be sold "is of a type customarily sold on a recognized market." Section 85-9-504 (3). We cannot approve the bank's contention that a used car falls in this category. Obviously the Code dispenses with notice in this situation only because the debtor would not be prejudiced by the want of notice. Thus a "recognized market" might well be a stock market or a commodity market, where sales involve many items so similar that individual differences are nonexistent or immaterial, where haggling and competitive bidding are not primary factors in each sale, and where the prices paid in actual sales of comparable property are currently available by quotation. We agree with the view taken in Pennsylvania, that there is no recognized market for used cars. *Alliance Discount Corp.* v. *Shaw,* 195 Pa. Superior Ct. 601, 171 A. 2d 548 (1961). What one 1957 Oldsmobile sells for does not fix the amount a different one may be expected to bring.

Secondly, "except in the case of consumer goods" Norton, if he was a person having a security interest known to the bank, would have been entitled to notice of the proposed sale. Section 85-9-504 (3). For the moment it is enough to say that all four briefs expressly or tacitly assume that the Oldsmobile was "consumer goods," because Goldsmith bought it as a pleasure vehicle. Hence Norton may not have been entitled to notice under this section of the Code.

We come to the main question: Was Norton a "debtor" to whom notice should have been given? The controlling definition appears in § 85-9-105 (d): " 'Debtor' means the person who owes payment *or other performance* [our italics] of the obligation secured, whether or not he owns or has rights in the collateral, and includes the seller of accounts, contract rights or chattel paper. Where the debtor and the owner of the

collateral are not the same person, the term 'debtor' . . . may include both where the context so requires . . ."

Norton had promised to repurchase the contract for the amount due. He was a person who owed "other performance" of the obligation. In our judgment the following illustration in Paragraph 4 of the official Comment to § 85-9-105 is conclusive of Norton's status as a debtor:

"4. A dealer sells a tractor to a farmer on conditional sales contract. The conditional sales contract is a 'security agreement,' the farmer is the 'debtor,' the dealer is the 'secured party' and the tractor is the type of 'collateral' defined in Section 9-109 as 'equipment.' But now the dealer transfers the contract to his bank, either by outright sale [the situation now before us] or to secure a loan. Since the conditional sales contract is a security agreement relating to specific equipment the conditional sales contract is now the type of collateral called 'chattel paper.' In this transaction between the dealer and his bank, the bank is the 'secured party,' the dealer is the 'debtor,' and the farmer is the "account debtor.' "

For the benefit of those who do not have ready access to the briefs on file in this case, and to the end that the *amici* may know why we do not fully agree with their position, we think it best to explain the arguments presented upon the question of whether Norton was a debtor. As the discussion submitted by Mr. Barrett and the Permanent Editorial Board is more detailed than that in any other brief we will direct our remarks to it.

Mr. Barrett and the Board draw a distinction between the note and contract ("chattel paper") on the one hand and the Oldsmobile on the other. It is their position that Goldsmith alone was the debtor with respect to the Oldsmobile; so Norton was not entitled to notice that it was to be sold. Norton, however, was the debtor with respect to the chattel paper and would have

been entitled to notice if the bank had decided to sell that paper.

The distinction urged by the Barrett-Board brief is not, in our opinion, clearly spelled out by the Code, whatever the intention of its draftsmen may have been. In many situations, including the one at bar, it might lead to injustice.

We attach significance to the fact that Mr. Barrett and the Board refer to the initial transaction between Norton and the bank as a "financing" of Norton by the bank. Yet that transaction was not a financing in the same sense that it would have been if Norton had pledged the Goldsmith chattel paper to secure Norton's own note to the bank. In that event if the bank decided to sell the Goldsmith paper to a third person and apply the proceeds to Norton's note, there would be a good reason for giving Norton notice of the proposed sale: to enable him to protect himself against a sale for an inadequate price.

But Norton was not "financed" by the bank in the sense of having a direct personal obligation to pay money in any event. He sold the Goldsmith chattel paper outright, assuming only a secondary liability if Goldsmith should default. In that situation if the bank should decide to sell the chattel paper to a third person, the terms of sale would be of no especial interest to Norton, for his secondary liability to the new holder would remain the same. Norton, however, was directly affected by the sale of the Oldsmobile; the amount obtained in that sale fixed his pecuniary liability. In simple fairness he should have had notice—a requirement entailing no real inconvenience or hardship to the bank.

In resting our decision on the matter of notice we do not imply that we necessarily agree with counsel's view that the Oldsmobile was "consumer goods" merely because Goldsmith bought it as a pleasure vehicle. No doubt the car was within the definition of consumer

goods as far as Goldsmith himself was concerned. Section 85-9-109. But, under § 85-9-504 (3), whether or not Norton, as a person having a pre-existing security interest in the car, was entitled to notice of sale might depend upon whether the car was consumer goods. Yet, as far as Norton was concerned in the matter of notice, it was completely immaterial that Goldsmith had originally bought the car for pleasure rather than for business. A principle should not be extended beyond its underlying reason. We reserve judgment upon this aspect of the case.

The bank also contends that Norton waived his right to notice of the sale by signing a printed assignment of the conditional sales contract (prepared by the bank) which recited that Norton waived all notices to which he might otherwise have been entitled. Under § 85-9-501 (3) the attempted waiver was ineffective.

Finally, what is Norton's measure of damages? We do not agree with his contention that the bank's failure to give him notice of the intended sale completely discharged his obligation. For the most part the Code follows the theory formerly applicable to mortgages, by which the debtor was entitled to any surplus realized upon foreclosure and was liable for any deficiency. Section 85-9-504 (2). The Code also provides that if the secured party has disposed of the collateral in a manner not in accordance with the Code "any person entitled to notification . . . has a right to recover from the secured party any loss caused by a failure to comply" with the provisions of the Code. Section 85-9-507 (1).

Upon the issue of Norton's damages simple considerations of fair play cast the burden of proof upon the bank. It was the bank which wrongfully disposed of the car without notice to the debtors. Thus it was the bank's action that made it at least difficult, if not impossible, for Norton to prove the extent of his loss with reasonable certainty. A chattel such as a car may well be a

thousand miles away before the debtor learns of its sale without notice. It would be manifestly unfair for the creditor to derive an advantage from its own misconduct. We think the just solution is to indulge the presumption in the first instance that the collateral was worth at least the amount of the debt, thereby shifting to the creditor the burden of proving the amount that should reasonably have been obtained through a sale conducted according to law. The extent to which the penalty set out in § 85-9-507 (1) may be applicable in the case at bar is an issue that may depend upon the further development of the proof.

Since the case was not tried upon the principles of law that we deem to be controlling the judgment must be reversed and the cause remanded for a new trial.

HARRIS, C. J., not participating.